**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUSAN PASKOWITZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CONNECTICUT WATER SERVICE, INC., CAROL P. WALLACE, DAVID C. BENOIT, RICHARD H. FORDE, MARY ANN HANLEY, HEATHER HUNT, BRADFORD A. HUNTER, KRISTEN A. JOHNSON, LISA J. THIBDAUE, and ELLEN C. WOLF,<br><br>Defendants. | ) | Case No. ______________<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**<u>COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934</u>**

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**<u>NATURE OF THE ACTION</u>**

1. This action stems from a proposed transaction announced on August 6, 2018 (the "Proposed Transaction"), pursuant to which Connecticut Water Service, Inc. ("Connecticut Water" or the "Company") will be acquired by SJW Group ("Parent") and Hydro Sub, Inc. ("Merger Sub," and together with Parent, "SJW").

2. On August 5, 2018, Connecticut Water's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger with SJW (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, if the Proposed Transaction is completed, Connecticut Water's shareholders will receive $70.00 for each share of Connecticut Water common stock they own.

3. On October 2, 2018, defendants filed a proxy statement with the United States Securities and Exchange Commission ("SEC") (the "Proxy Statement") in connection with the Proposed Transaction.

4. The Proxy Statement, which scheduled a stockholder vote on the Proposed Transaction for November 16, 2018, omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Connecticut Water common stock.

9. Defendant Connecticut Water is a Connecticut corporation and maintains its principal executive offices at 93 West Main Street, Clinton, Connecticut 06413. Connecticut

Water's common stock is traded on the NasdaqGS under the ticker symbol "CTWS." Connecticut Water is a party to the Merger Agreement.

10. Defendant Carol P. Wallace ("Wallace") is the Chairman of the Board of Connecticut Water.

11. Defendant David C. Benoit ("Benoit") is a director, and the President and Chief Executive Officer ("CEO") of Connecticut Water.

12. Defendant Richard H. Forde ("Forde") is a director of Connecticut Water.

13. Defendant Mary Ann Hanley ("Hanley") is a director of Connecticut Water.

14. Defendant Heather Hunt ("Hunt") is a director of Connecticut Water.

15. Defendant Bradford A. Hunter ("Hunter") is a director of Connecticut Water.

16. Defendant Kristen A. Johnson ("Johnson") is a director of Connecticut Water.

17. Defendant Lisa J. Thibdaue ("Thibdaue") is a director of Connecticut Water.

18. Defendant Ellen C. Wolf ("Wolf") is a director of Connecticut Water.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of Connecticut Water (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of March 12, 2018, there were approximately 11,861,315 shares of Connecticut Water common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout

the country.

23. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company***

27. Connecticut Water was incorporated in 1974, with its largest subsidiary, The Connecticut Water Company ("CWC"), being organized in 1956. Connecticut Water is a non-operating holding company, whose income is derived from the earnings of its six wholly-owned subsidiary companies.

28. In 2017, approximately 95% of the Company's net income was attributable to water operations carried out within its four regulated water companies: CWC; The Heritage Village Water Company ("HVWC"); The Avon Water Company ("Avon Water"); and The Maine Water Company ("Maine Water") (collectively, the "Regulated Companies"). CWC, HVWC, and Avon Water are regulated by the Connecticut Public Utilities Regulatory Authority (the "PURA") and Maine Water is regulated by the Maine Public Utilities Commission (the "MPUC").

29. As of December 31, 2017, the Regulated Companies supplied water to 135,645 customers, representing a population of approximately 450,000, in 80 municipalities throughout Connecticut and Maine and more than 3,000 wastewater customers in Southbury, Connecticut. The Regulated Companies are subject to state regulation regarding financial issues, rates, and operating issues, and to various other state and federal regulatory agencies concerning water quality and environmental standards.

30. In addition to its Regulated Companies, the Company owns two active unregulated companies: Chester Realty, Inc., a real estate company in Connecticut; and New England Water Utility Services, Inc., which provides contract water and sewer operations and other water related services. In 2017, these unregulated companies, together with real estate transactions within CWC, contributed the remaining 5% of the Company's net income through real estate transactions as well as services and rentals.

***The Previous Proposed Transaction***

31. On March 14, 2018, the Individual Defendants caused the Company to enter into an agreement and plan of merger with SJW (the "Previous Merger Agreement").

32. Pursuant to the terms of the Previous Merger Agreement, Connecticut Water's shareholders would have received 1.1375 shares of Parent common stock for each share of

Connecticut Water common stock they owned (the "Previous Proposed Transaction").

33. Pursuant to the Previous Merger Agreement, Parent stockholders immediately prior to the Previous Proposed Transaction would have owned approximately 60% of the combined company, and Connecticut Water shareholders would have owned approximately 40% of the combined company. The combined company would have been listed on the NYSE initially under Parent's ticker symbol, "SJW."

34. According to the press release announcing the Previous Proposed Transaction:

> SJW Group (NYSE: SJW) and Connecticut Water Service, Inc. (NASDAQ: CTWS) today announced that both companies' boards of directors have unanimously approved a definitive agreement to combine through a merger of equals to create the 3rd largest investor-owned water and wastewater utility in the United States, based on pro forma enterprise value and combined rate base.
>
> The combined company will have a strong multi-state presence with high-quality and well-run operations, and constructive regulatory relationships in California, Connecticut, Maine and Texas. It will serve more than 1.5 million people with over 700 employees. In addition to expanding its market presence, the increased scale and more diverse geographic footprint of the new organization provide the opportunity for investments in service and reliability that can enhance value for shareholders as well as for customers and communities. The combined company would have had operating revenue of approximately $496 million and recurring net income of $74 million based on a 2017 pro forma basis.
>
> Under the terms of the agreement, Connecticut Water shareholders will receive 1.1375 shares of SJW Group common stock for each share of Connecticut Water common stock they own, the equivalent of $61.86 per share, or about $750 million in the aggregate, based on SJW Group's closing stock price as of March 14, 2018, and the agreed upon exchange ratio. Following closing of the transaction, SJW Group shareholders will own approximately 60 percent of the combined company, and Connecticut Water shareholders will own approximately 40 percent, on a fully diluted basis. Based on each company's closing share price as of March 14, 2018 and the 1.1375x transaction exchange ratio, the combined company would have a pro forma $1.9 billion equity value and a $2.6 billion enterprise value. . . .
>
> **Leadership and Headquarters**
>
> The combined company will be led by an experienced Board of Directors and leadership team that leverages the strengths and capabilities of its subsidiaries. All utility and operating subsidiaries will continue under existing local leadership and

> brand names – San Jose Water, SJWTX, Inc., SJW Land Company, Connecticut Water Company, Maine Water Company, Avon Water Company and Heritage Village Water Company.
>
> Upon closing of the transaction, the Board of Directors of the combined company will consist of 12 directors, with seven directors appointed by SJW Group and five directors, including the Lead Independent Director, appointed by Connecticut Water.
>
> Eric W. Thornburg will serve as Chairman, President and Chief Executive Officer of the newly-merged company. David C. Benoit will serve as President, New England Region, overseeing the New England operations, including Connecticut Water. In addition, Andrew R. Gere will continue serving as President and Chief Operating Officer of San Jose Water, Thomas Hodge will continue serving as President of SJWTX, Inc. and Richard Knowlton will continue serving as President of Maine Water Company. James Lynch will serve as Chief Financial Officer of the newly combined company, Kristen Johnson will serve as Chief Human Resource Officer, Suzy Papazian will serve as General Counsel and Corporate Secretary, Andrew Walters will serve as Chief Administrative Officer and Maureen Westbrook will serve as Senior Vice President of External Affairs.
> The combined company's headquarters will be located in San Jose, CA, with the New England headquarters located in Clinton, CT.
>
> **Timing and Approvals**
>
> The transaction, which is expected to close by year-end 2018, is subject to customary closing conditions and approvals, including the approval of the issuance of shares in the transaction by SJW Group stockholders, the approval of Connecticut Water shareholders, the approvals of the Connecticut Public Utilities Regulatory Authority and the Maine Public Utilities Commission, the approval of the Federal Communications Commission, and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act. The transaction is not subject to any financing condition.

***Third Party Acquisition Offers Following the Announcement of the Previous Proposed Transaction***

35. After the Previous Proposed Transaction was announced, third parties made offers to acquire each of Connecticut Water and Parent.

***Eversource Energy***

36. On April 5, 2018, Eversource Energy ("Eversource") submitted a proposal to acquire Connecticut Water for $63.50 in cash and/or Eversource common shares, at the election

of the Company's shareholders (the "Eversource Proposal").

37. On April 19, 2018, Connecticut Water issued a press release that confirmed that it received the Eversource Proposal, but that the Board determined that the Eversource Proposal did not constitute a "Superior CTWS Proposal," which was defined in the Previous Merger Agreement as follows:

> "Superior CTWS Proposal" means any bona fide written offer made by a third party or group pursuant to which such third party (or in a merger or consolidation involving such party, the stockholders of such third party) or group would acquire, directly or indirectly, more than 50% of the CTWS Common Stock or all or substantially all of the assets of CTWS and the CTWS Subsidiaries, taken as a whole, (i) on terms which the CTWS Board determines in its reasonable judgment (after consultation with outside counsel and the CTWS Financial Advisor or another financial advisor of nationally recognized reputation) to be superior to the Merger, taking into account all of the terms and conditions of such offer (including the legal, financial, regulatory, the availability and terms of any required financing, timing and other aspects of the proposal, the identity of the Person making the proposal, any risks of non-consummation of the proposal and any other factors, including those specified in Article Fifth, Section(d) of the CTWS Charter and Section 33-756(g) of the CBCA, that the CTWS Board determines are appropriate under the circumstances) and this Agreement (including any changes proposed by SJW to the terms of this Agreement) and (ii) that is reasonably likely to be completed on the terms proposed taking into account all legal, financial, regulatory and other aspects of such proposal, and is fully financed and for which financing (if required) is fully committed and reasonably likely to be obtained.

38. Pursuant to Section 5.03 of the Previous Merger Agreement:

> Notwithstanding the foregoing, at any time prior to obtaining the CTWS Shareholder Approval, in response to a bona fide written CTWS Takeover Proposal that the CTWS Board determines in good faith (after consultation with outside counsel and the CTWS Financial Advisor or another financial advisor of nationally recognized reputation) constitutes or is reasonably likely to lead to a Superior CTWS Proposal, and that did not result from a material breach of this Section 5.03(a), CTWS, and its Representatives at the request of CTWS, may, subject to compliance with Section 5.03(c), (x) furnish information with respect to CTWS and the CTWS Subsidiaries to the Person making such CTWS Takeover Proposal (and its Representatives) (provided that all such information has previously been provided to SJW or is provided to SJW prior to or substantially concurrent with the time it is provided to such Person) pursuant to a customary confidentiality agreement that, taken as a whole, is not materially less restrictive of such Person than the Confidentiality Agreement; provided that such confidentiality agreement

shall not be required to contain standstill provisions (a "CTWS Acceptable Confidentiality Agreement") and (y) participate in discussions regarding the terms of such CTWS Takeover Proposal and the negotiation of such terms with, and only with, the Person making such CTWS Takeover Proposal (and such Person's Representatives). Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in this Section 5.03(a) by any CTWS Subsidiary or any of its or their Representatives shall constitute a breach of this Section 5.03(a) by CTWS.

(b) Except as set forth below, neither the CTWS Board nor any committee thereof shall (i) (A) withdraw (or modify or qualify in any manner adverse to SJW or Merger Sub), or propose publicly to withdraw (or modify or qualify in any manner adverse to SJW or Merger Sub), the CTWS Recommendation or (B) adopt, approve, recommend or declare advisable, or propose publicly to adopt, approve, recommend or declare advisable, any CTWS Takeover Proposal (any action in this clause (i) being referred to as a "CTWS Adverse Recommendation Change") or (ii) approve, recommend or declare advisable, or propose publicly to approve, recommend or declare advisable, or allow CTWS or any of its Affiliates to execute or enter into, any Acquisition Agreement (other than a CTWS Acceptable Confidentiality Agreement) constituting or that would reasonably be expected to lead to any CTWS Takeover Proposal. Notwithstanding the foregoing, at any time prior to obtaining the CTWS Shareholder Approval, the CTWS Board may make a CTWS Adverse Recommendation Change if the CTWS Board determines in good faith (after consultation with outside counsel and the CTWS Financial Advisor or another financial advisor of nationally recognized reputation) that the failure to do so would be inconsistent with its fiduciary duties under applicable Law; provided, however, that CTWS shall not be entitled to exercise its right to make a CTWS Adverse Recommendation Change in connection with a CTWS Takeover Proposal or a Superior CTWS Proposal until after 96 hours following SJW's receipt of written notice (a "CTWS Notice of Recommendation Change") from CTWS advising SJW that the CTWS Board intends to make a CTWS Adverse Recommendation Change and specifying the reasons therefor, including the terms and conditions of any CTWS Takeover Proposal or Superior CTWS Proposal that is the basis of the proposed action by the CTWS Board (it being understood and agreed that any amendment to the financial terms or any other material term of such CTWS Takeover Proposal or Superior CTWS Proposal shall require a new CTWS Notice of Recommendation Change, except that any subsequent notice period shall be reduced to 72 hours). In determining whether to make a CTWS Adverse Recommendation Change, the CTWS Board shall take into account any changes to the terms of this Agreement proposed by SJW in response to a CTWS Notice of Recommendation Change or otherwise, and, if requested by SJW, CTWS shall engage in good faith negotiations with SJW regarding any changes to the terms of this Agreement proposed by SJW during the required notice period.

39. On April 27, 2018, Eversource filed a preliminary proxy statement on Form

PREC14A with the SEC (the "Eversource Proxy"), which solicited proxies from the Company's stockholders to vote against the Previous Proposed Transaction. In the Eversource Proxy, Eversource stated, among other things:

> Eversource continues to believe that the Eversource Proposal is a superior alternative to the all-stock transaction proposed in the SJW Merger Proposal. The Eversource Proposal represents a premium of 21% to CTWS's closing share price on March 14, 2018, the day prior to the announcement of the Proposed SJW Merger. The Eversource Proposal also represents a premium of 22% to CTWS's 20-day volume-weighted average price as of March 14, 2018. In addition, those CTWS shareholders who elect to receive Eversource shares would realize the equivalent of an 81% dividend uplift based on the closing price of Eversource's shares on April 4, 2018 and the annualized quarterly dividend of $0.2975 per share declared by CTWS on January 18, 2018.
>
> Eversource remains confident that the Eversource Proposal offers greater and more certain value for CTWS shareholders as compared with the SJW Merger Proposal. Eversource firmly views the Eversource Proposal as reasonably likely to lead to a "Superior CTWS proposal" as defined in the SJW Merger Agreement, and in the best interest of the shareholders, employees, customers and local communities of CTWS.
>
> Eversource is disappointed that the CTWS Board has been unwilling to engage in discussions with Eversource and urges the CTWS Board to act in the best interests of the CTWS shareholders by meeting with Eversource to seriously discuss the Eversource Proposal.
>
> Eversource is specifically soliciting proxies from CTWS shareholders to vote "**AGAINST**" the SJW Merger Proposal, the Compensation Proposal and the Adjournment Proposal.

40. On July 13, 2018, the Company announced that it received an increased proposal from Eversource to acquire the Company for $64.00 per share (the "Eversource Revised Proposal"), but that the Board determined that the Eversource Revised Proposal did not constitute a "Superior CTWS Proposal."

***California Water Service Group***

41. On April 4, 2018, California Water Service Group ("California Water") privately submitted a written all-cash proposal to Parent's Board of Directors (the "SJW Board") to acquire

100% of the issued and outstanding Parent shares for $68.25 per share (the "California Water Proposal").

42. On April 13, 2018, the SJW Board met and voted to reject the California Water Proposal and also determined that it neither constituted nor was reasonably likely to lead to a "Superior SJW Proposal," which was defined in the Previous Merger Agreement as follows:

> "Superior SJW Proposal" means any bona fide written offer made by a third party or group pursuant to which such third party (or in a merger or consolidation involving such party, the stockholders of such third party) or group would acquire, directly or indirectly, more than 50% of the SJW Common Shares or all or substantially all of the assets of SJW and the SJW Subsidiaries, taken as a whole, (i) on terms which the SJW Board determines in its reasonable judgment (after consultation with outside counsel and the SJW Financial Advisor or another financial advisor of nationally recognized reputation) to be superior to the Merger, taking into account all of the terms and conditions of such offer (including the legal, financial, regulatory, the availability and terms of any required financing, timing and other aspects of the proposal, the identity of the Person making the proposal, any risks of non-consummation of the proposal and any other factors that the SJW Board determines are appropriate under the circumstances) and this Agreement (including any changes proposed by CTWS to the terms of this Agreement) and (ii) that is reasonably likely to be completed on the terms proposed taking into account all legal, financial, regulatory and other aspects of such proposal, and is fully financed and for which financing (if required) is fully committed and reasonably likely to be obtained.

43. Pursuant to Section 5.02 of the Previous Merger Agreement:

> Notwithstanding the foregoing, at any time prior to obtaining the SJW Stockholder Approval, in response to a bona fide written SJW Takeover Proposal that the SJW Board determines in good faith (after consultation with outside counsel and the SJW Financial Advisor or another financial advisor of nationally recognized reputation) constitutes or is reasonably likely to lead to a Superior SJW Proposal, and that did not result from a material breach of this Section 5.02(a), SJW, and its Representatives at the request of SJW, may, subject to compliance with Section 5.02(c), (x) furnish information with respect to SJW and the SJW Subsidiaries to the Person making such SJW Takeover Proposal (and its Representatives) (provided that all such information has previously been provided to CTWS or is provided to CTWS prior to or substantially concurrent with the time it is provided to such Person) pursuant to a customary confidentiality agreement that, taken as a whole, is not materially less restrictive of such Person than the Confidentiality Agreement; provided that such confidentiality agreement shall not be required to contain standstill provisions (a "SJW Acceptable Confidentiality Agreement"), and

(y) participate in discussions regarding the terms of such SJW Takeover Proposal and the negotiation of such terms with, and only with, the Person making such SJW Takeover Proposal (and such Person's Representatives). Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in this Section 5.02(a) by any SJW Subsidiary or any of its or their Representatives shall constitute a breach of this Section 5.02(a) by SJW.

(b) Except as set forth below, neither the SJW Board nor any committee thereof shall (i) (A) withdraw (or modify or qualify in any manner adverse to CTWS), or propose publicly to withdraw (or modify or qualify in any manner adverse to CTWS), the SJW Recommendation or (B) adopt, approve, recommend or declare advisable, or propose publicly to adopt, approve, recommend or declare advisable, any SJW Takeover Proposal (any action in this clause (i) being referred to as a "SJW Adverse Recommendation Change") or (ii) approve, recommend or declare advisable, or propose publicly to approve, recommend or declare advisable, or allow SJW or any of its Affiliates to execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, alliance agreement, partnership agreement or other agreement or arrangement (each, an "Acquisition Agreement") (other than a SJW Acceptable Confidentiality Agreement) constituting or that would reasonably be expected to lead to any SJW Takeover Proposal. Notwithstanding the foregoing, at any time prior to obtaining the SJW Stockholder Approval, the SJW Board may make a SJW Adverse Recommendation Change if the SJW Board determines in good faith (after consultation with outside counsel and the SJW Financial Advisor or another financial advisor of nationally recognized reputation) that the failure to do so would be inconsistent with its fiduciary duties under applicable Law; provided, however, that SJW shall not be entitled to exercise its right to make a SJW Adverse Recommendation Change in connection with a SJW Takeover Proposal or a Superior SJW Proposal until after 96 hours following CTWS's receipt of written notice (a "SJW Notice of Recommendation Change") from SJW advising CTWS that the SJW Board intends to make a SJW Adverse Recommendation Change and specifying the reasons therefor, including the terms and conditions of any SJW Takeover Proposal or Superior SJW Proposal that is the basis of the proposed action by the SJW Board (it being understood and agreed that any amendment to the financial terms or any other material term of such SJW Takeover Proposal or Superior SJW Proposal shall require a new SJW Notice of Recommendation Change, except that any subsequent notice period shall be reduced to 72 hours). In determining whether to make a SJW Adverse Recommendation Change, the SJW Board shall take into account any changes to the terms of this Agreement proposed by CTWS in response to a SJW Notice of Recommendation Change or otherwise, and, if requested by CTWS, SJW and Merger Sub shall engage in good faith negotiations with CTWS regarding any changes to the terms of this Agreement proposed by CTWS during the required notice period.

44. California Water was made aware of the SJW Board's determinations for the first

time in the registration statement filed with the SEC on April 25, 2018 (including the amendments thereto, the "Registration Statement"), and in a private letter sent by the SJW Board to California Water concurrently with the filing of the Registration Statement.

45. On the morning of April 26, 2018, before the opening of the market, California Water issued a press release confirming that it had previously delivered to Parent an all-cash proposal to acquire Parent for $68.25 per share. Concurrent with the issuance of the press release, California Water delivered to Parent a letter reiterating its $68.25 all-cash proposal. Later in the morning of April 26, 2018, Parent issued a press release reaffirming its rejection of California Water's $68.25 per share all-cash proposal.

46. On May 2, 2018, California Water filed a preliminary proxy statement on Form PREC14A with the SEC (the "California Water Proxy"), which solicited proxies from Parent's stockholders to vote against the Previous Proposed Transaction. In the California Water Proxy, California Water stated, among other things:

> We believe that the California Water Acquisition Proposal, if consummated, would be economically superior to the Proposed CTWS Merger for SJW stockholders because it would provide SJW stockholders an opportunity to receive a significant premium for their shares of common stock of SJW ("*SJW Shares*"). In that regard, the California Water Acquisition Proposal to acquire SJW for $68.25 per SJW Share in cash:
>
> - exceeds SJW's all-time high closing price of $68.13 as of November 30, 2017;
>
> - represents a 30% premium to the $52.41 closing price of the SJW Shares on April 3, 2018, the day prior to California Water's April 4, 2018 proposal; and
>
> - represents a 20% premium to the $56.90 closing price of the SJW Shares on April 25, 2018, the last trading day prior to the public announcement of the California Water Acquisition Proposal.
>
> In contrast, if the Proposed CTWS Merger is completed, the SJW stockholders will retain their SJW Shares and receive no premium, while paying CTWS shareholders a premium of 18% (based on the relative closing price of SJW and CTWS shares on the last trading day prior to the announcement of the Proposed CTWS Merger).

* * *

We believe that the Proposed CTWS Merger is an inferior transaction, as compared to the California Acquisition Proposal, because among other things:

• **If the Proposed CTWS Merger is completed, SJW stockholders would be forced to wait for uncertain economic benefits that would not fully accrue until the long term,** while bearing the substantial execution risks associated with operating two separate businesses located 3,000 miles apart in different regulatory environments.

• **Following completion of the Proposed CTWS Merger, SJW would be led by a Board and CEO who in our view are largely unfamiliar with the San Jose community and the unique challenges of running a California-based water utility.** Six out of 12 directors for the new SJW/CTWS Board would come from CTWS—five are current CTWS directors and the sixth is SJW's Chief Executive Officer, Eric Thornburg, who ran CTWS for more than 11 years, until last September 2017.

• **The path to completion is uncertain** given that a third party, Eversource Energy, has submitted a proposal to acquire CTWS and is soliciting proxies from CTWS shareholders to vote against the Proposed CTWS Merger. Since the Proposed CTWS Merger requires the approval of holders of two-thirds of the outstanding CTWS common shares, we believe that the Eversource Energy proposal and solicitation creates a high degree of uncertainty around the completion of the Proposed CTWS Merger.

• **The Proposed CTWS Merger requires regulatory approvals in both Connecticut and Maine.** We believe that regulators in these two states have no formal relationships with SJW given SJW's lack of operations in either state, which could delay the timely receipt of requisite approvals in one or both jurisdictions.

47. On June 7, 2018, California Water, through a subsidiary, commenced a tender offer to acquire all of Parent's outstanding common stock for $68.25 per share in cash.

48. On July 20, 2018, California Water announced that it was extending the tender offer through September 28, 2018.

49. On August 13, 2018, California Water submitted an increased proposal to acquire all of Parent's outstanding common stock for $70.00 per share in cash (the "Revised California

Water Proposal"), stating:

> On behalf of California Water Service Group ("Cal Water"), I am pleased to submit a revised proposal to acquire SJW Group ("SJW") for $70.00 per share in cash, an increase of $1.75 per share from our previously proposed price of $68.25. Our proposal represents a premium of 33.6% to SJW's closing stock price on April 3, 2018, the day prior to our initial $68.25 offer, and a 32.0x multiple to the projected 2019 earnings per share reflected in your S-4. We are open to discussing a higher purchase price that may be supported by due diligence and additional synergies that we may jointly identify.
>
> In the interest of accommodating some of the concerns you have previously highlighted, we would be willing to consider transaction structures that achieve tax deferral on gains from the sale of SJW shares for SJW stockholders with a historical low tax basis and who may prefer to own stock of our combined company. We would also welcome the addition of up to two SJW designees to the Cal Water Board of Directors, and would consider inviting some of your executive team members to join Cal Water.
>
> We believe our revised offer provides substantial and certain value in cash for SJW shares at a highly compelling premium for your stockholders and addresses concerns raised by SJW with respect to other key stakeholders. Given the combination of California Water and SJW features a clear strategic rationale and offers substantially greater benefits to customers, employees and the communities we collectively serve than your proposed combination with Connecticut Water, we are committed to finding a path to bring our companies together.
>
> We remain confident that we can complete our proposed transaction within the same timeframe as your pending deal with Connecticut Water. In light of that, we are prepared to compensate your stockholders with a ticking fee of $0.50 per quarter in the event the deal is not consummated within a pre-agreed timeframe due to state regulatory issues, of which we expect none.
>
> As you might expect, assuming you decide to proceed with negotiations, we will finalize committed financing for our proposed transaction prior to signing definitive agreements. With your cooperation we believe this is a process that can be completed promptly, as demonstrated by the financing you obtained for your proposed all-cash acquisition of Connecticut Water. Our financing package will be no more conditional than you propose for Connecticut Water.
>
> As part of our proposal, we are also prepared to allow for a 45-day go shop period following execution of a transaction with us. This will address your stated concern of engaging in a sale of SJW without soliciting offers from multiple prospective purchasers.
>
> Our advisors and we stand ready to commence discussions as early as this weekend.

> As you know, we will need to amend our tender offer materials on Monday morning, but would be pleased to coordinate communications before making this letter public. We will not leave this proposal outstanding indefinitely, and look forward to hearing from you.

50. On August 17, 2018, California Water announced that the SJW Board rejected the Revised California Water Proposal, and that, therefore, California Water was withdrawing the Revised California Water Proposal. California Water's August 17, 2018 press release stated:

> California Water Service Group ("California Water") (NYSE: CWT) today announced that it has withdrawn its revised proposal to acquire SJW Group ("SJW") (NYSE: SJW) for $70.00 per share in cash after it was rejected by the SJW Board. California Water will also terminate its tender offer to acquire all outstanding shares of SJW common stock.
>
> "California Water is financially disciplined, and after repeated attempts to engage with the SJW Board of Directors, we believe it is in our stockholders' best interests to withdraw our proposal and focus on other opportunities," said Martin A. Kropelnicki, President and CEO of California Water.
>
> Mr. Kropelnicki continued, "It is unfortunate that the SJW Board concluded that our offer was not likely to lead to a superior transaction without availing themselves the opportunity to enter into a single discussion with us. Although we are disappointed by their unwillingness to engage, we are confident we have an excellent growth strategy in place that will continue to deliver long-term stockholder value. As we build on our long track record of success, we will remain committed to enhancing the quality of life for our customers, communities, and employees."

***The Proposed Transaction***

51. On August 5, 2018, the Individual Defendants caused the Company to enter into the Merger Agreement with SJW.

52. Pursuant to the terms of the Merger Agreement, if the Proposed Transaction is completed, Connecticut Water's shareholders will receive $70.00 for each share of Connecticut Water common stock they own.

53. According to the press release announcing the Proposed Transaction:

> SJW Group (NYSE: SJW) ("SJW Group") and Connecticut Water Service, Inc.

(NASDAQ: CTWS) ("Connecticut Water") today announced that they have amended the terms of their previously announced merger agreement from a stock-for-stock transaction to an all-cash acquisition of all outstanding common shares of Connecticut Water by SJW Group for $70.00 per Connecticut Water common share. The cash transaction, which has a value of $1.1 billion and an equity purchase price of $843 million, is expected to be immediately accretive to SJW Group's earnings per share (EPS) in 2019 (post-close), increasing each year thereafter to high single-digit percentage EPS accretion in 2021.

The SJW Group and Connecticut Water Service Board of Directors each approved the amended merger agreement to help facilitate the closing of the companies' transformative combination and ensure that their shareholders, customers, employees and communities realize its significant benefits. The respective Boards also believe that the $70.00 per share cash consideration will resolve any market distractions resulting from otherwise-inferior proposals for Connecticut Water. The amended merger agreement was unanimously approved by the Connecticut Water Board of Directors and by all SJW Group directors other than Eric Thornburg, who abstained from voting due to his ownership of Connecticut Water shares and the all-cash nature of the acquisition. . . .

AMENDED TERMS

Under the terms of the amended agreement, SJW Group will acquire all of the issued and outstanding common shares of Connecticut Water at a price of $70.00 per common share. This represents a superior offer with a significant premium of 33% to Connecticut Water's unaffected closing share price of $52.57 on March 14, 2018 and exceeds Connecticut Water's all-time high price of $69.72 per common share.

Following the close of the all-cash merger, SJW Group's Board of Directors will expand by two seats, with the two vacancies to be filled by current Connecticut Water Service directors to be appointed by SJW Group to further bolster the Board's expertise in the New England market. The combined company's headquarters will be located in San Jose, CA, and its New England headquarters will be located in Clinton, CT. Members of Connecticut Water's current executive team are expected to lead the New England region of the combined company. The combined company will be called SJW Group, with the New England organization known as Connecticut Water Service, Inc., and each of the company's current operating subsidiaries will continue to operate under their existing brand names. . . .

CONSERVATIVE FINANCING

J.P. Morgan is providing committed financing for the revised transaction in the form of a new $975 million bridge loan facility. SJW Group will assume Connecticut Water's existing debt and ultimately fund the $843 million equity

purchase price through a conservative mix of debt and equity, with $450-550 million of equity. SJW Group anticipates that this conservative financing mix will allow SJW Group to maintain an attractive, strong investment grade credit rating of at least "A-", enabling continued investment in the infrastructure, operations and customer service capabilities of the combined company. Additionally, SJW Group anticipates that it will be able to continue SJW Group's robust dividend history and continue to pay an attractive and consistent cash dividend to shareholders.

CLOSING CONDITIONS

The revised transaction, which is expected to close in the first quarter of 2019, is subject to customary closing conditions and approvals, including the approval of Connecticut Water shareholders, the approvals of the Connecticut Public Utilities Regulatory Authority and the Maine Public Utilities Commission and the approval of the Federal Communications Commission. The waiting period under the Hart-Scott-Rodino Antitrust Improvements Act was terminated early on April 27, 2018. The California Public Utilities Commission (CPUC) previously instituted an investigation into whether the transaction is subject to its approval and anticipated impacts in California. The CPUC is planning to complete its inquiry in time to allow the acquisition to go forward, if appropriate, by the end of 2018. It is anticipated that consideration of the revised transaction will not substantially extend the current CPUC investigation.

The transaction is not subject to any financing condition. The revised transaction does not require approval from SJW Group shareholders and the previously anticipated special meeting of SJW Group shareholders to vote on the revised transaction will not take place.

Connecticut Water Service's Board of Directors unanimously recommends that Connecticut Water shareholders vote in favor of the revised transaction. A date for the special meeting of Connecticut Water shareholders to vote on the revised transaction will be set in the near future.

SJW Group's Board of Directors unanimously recommends that SJW Group shareholders discard the white cards and any materials received from California Water Service (NYSE: CWT) as part of its tender offer solicitation to acquire SJW Group. If SJW Group shareholders have previously tendered their shares, they may revoke their tender by contacting Georgeson LLC using the contact information provided below.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

54. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

55. The Proxy Statement, which scheduled a stockholder vote on the Proposed Transaction for November 16, 2018, omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

56. *First*, the Proxy Statement omits material information regarding the Company's financial projections and the valuation analyses performed by the Company's financial advisor in connection with the Proposed Transaction, Wells Fargo Securities, LLC ("Wells Fargo").

57. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

58. The Proxy Statement fails to disclose certain important financial projections of Connecticut Water that were relied upon by Wells Fargo to perform its valuation analyses. For example, the Proxy Statement indicates that "Wells Fargo Securities performed a discounted cash flow analysis for the Company by calculating the estimated net present value (as of June 30, 2018) of the projected unlevered free cash flows of the Company for the six months ending December 31, 2018 through the year ending December 31, 2022." Further, the Proxy Statement states that "[u]nlevered free cash flows were calculated as EBITDA less cash taxes, capital expenditures and increases in net working capital."

59. However, the Proxy Statement fails to disclose the unlevered free cash flows of Connecticut Water that were used by Wells Fargo in its analysis. The Proxy Statement also fails

to disclose all of the line item projections used to calculate the Company's unlevered free cash flows. These projections are material to Connecticut Water stockholders because they were used in Wells Fargo's valuation analyses and have been relied upon by the Board to approve the Proposed Transaction. Without this information, the Proxy Statement is rendered misleading.

60. Further, the Proxy Statement discloses EBITDA projections for Connecticut Water, which is a non-GAAP (generally accepted accounting principles) financial measure, but the Proxy Statement fails to provide stockholders with the necessary line item projections for the metrics used to calculate the non-GAAP EBITDA measure or otherwise reconcile the non-GAAP EBITDA projections to the most comparable GAAP measures.

61. To avoid misleading stockholders with non-GAAP financial measures in business combinations such as the Proposed Transaction, publicly traded companies must provide a reconciliation of the differences between the non-GAAP financial measures with the most comparable financial measures calculated and presented in accordance with GAAP. Stockholders are entitled to the line item projections used to calculate Connecticut Water's non-GAAP EBITDA projections or a reconciliation of the non-GAAP projections to the most comparable GAAP measures.

62. Additionally, the Proxy Statement provides that:

> In arriving at its opinion, Wells Fargo Securities, among other things . . . reviewed . . . financial forecasts for SJW for the fiscal years ending December 31, 2018 through December 31, 2022 prepared and provided to Wells Fargo Securities by SJW management, as approved by management of the Company for use in Wells Fargo Securities' opinion (the "SJW projections").

63. However, the Proxy Statement fails to disclose the "SJW projections" and any revisions thereto, including the unlevered free cash flows for Parent and all line items used to calculate unlevered free cash flow.

64. With respect to Wells Fargo's Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) Connecticut Water's projected unlevered free cash flows as well as all underlying line items; (ii) Wells Fargo's basis for selecting a perpetuity growth rate of 1.50%; (iii) the specific inputs and assumptions underlying the discount rates ranging from 5.79% to 6.74% applied by Wells Fargo in the analysis; (iv) the terminal exit multiples implied by Wells Fargo's analysis; and (v) how stock-based compensation was treated in Wells Fargo's analysis.

65. Moreover, the Proxy Statement fails to explain certain variations in Wells Fargo's financial analyses performed in connection with the Previous Proposed Transaction (a summary of which is contained in the Registration Statement), and Wells Fargo's analyses performed in connection with the Proposed Transaction, despite the fact that Wells Fargo apparently used the same underlying key inputs.

66. For example, Wells Fargo performed a Selected Companies Analysis in connection with both the Previous Proposed Transaction and the Proposed Transaction, and observed the same companies and multiples in both versions of the analysis.

67. Specifically, in both versions of the analysis, Wells Fargo observed: (i) American States Water Company; (ii) Artesian Resources Corporation; (iii) California Water Service Group; (iv) Middlesex Water Company; (v) SJW Group; and (vi) The York Water Company.

68. In both versions of the analysis, Wells Fargo also reviewed the following financial data: (i) the price as a multiple of the estimated earnings per share for the calendar year ending December 31, 2018 ("2018E EPS"); and (ii) the price as a multiple of the estimated earnings per share for the calendar year ending December 31, 2019 ("2019E EPS").

69. Despite Wells Fargo's apparent use of the same companies and same financial data in both versions of the analysis, the results differ.

70. The Registration Statement filed in connection with the Previous Proposed Transaction provides: "Taking into account the results of the selected companies analysis, Wells Fargo Securities applied multiple ranges of 22.5x to 27.0x to CTWS's 2018E EPS and 20.5x to 25.0x to CTWS's 2019E EPS." Therefore, the results of Wells Fargo's Selected Companies Analysis performed in connection with the Previous Proposed Transaction were as follows, compared to the $61.62 merger consideration being offered in the Previous Proposed Transaction:

| | Implied Price per Share | |
|---|---|---|
| | **Low** | **High** |
| 2018E EPS | $ 52.39 | $ 62.87 |
| 2019E EPS | $ 49.32 | $ 60.15 |

The implied price per share reference ranges were then compared to CTWS's closing price per share of $52.19 as of March 13, 2018 and the implied offer price per share of $61.62, based on the proposed exchange ratio of 1.1375x.

71. However, the Proxy Statement filed in connection with the Proposed Transaction provides: "Taking into account the results of the selected companies analysis, Wells Fargo Securities applied multiple ranges of 27.0x to 32.0x to the Company's 2018E EPS and 25.0x to 29.0x to the Company's 2019E EPS." Thus, the results of Wells Fargo's Selected Companies Analysis performed in connection with the Proposed Transaction were as follows, compared to the $70.00 merger consideration being offered in the Proposed Transaction:

| | Implied Price per Share | |
|---|---|---|
| | **Low** | **High** |
| 2018E EPS | $ 62.82 | $ 74.45 |
| 2019E EPS | $ 60.15 | $ 69.77 |

The implied price per share reference ranges were then compared to the offer price of $70.00 per share of Company common stock.

72. Wells Fargo also performed a Discounted Cash Flow Analysis for Connecticut Water in connection with both the Previous Proposed Transaction and the Proposed Transaction.

73. Wells Fargo apparently used the same unlevered free cash flows for Connecticut Water in both versions of the analysis (which defendants failed to, but must, disclose), and applied

the same perpetuity growth rate of 1.50%.

74. However, Wells Fargo applied discount rates ranging from 5.65% to 6.70% in its Discounted Cash Flow Analysis performed in connection with the Previous Proposed Transaction, yet applied discount rates ranging from 5.79% to 6.74% in its Discounted Cash Flow Analysis performed in connection with the Proposed Transaction. The Proxy Statement must disclose Wells Fargo's basis for using different discount rates in both versions of the analysis, including the specific inputs and assumptions underlying the discount rates applied by Wells Fargo.

75. The Proxy Statement further fails to disclose the reason Wells Fargo apparently did not perform a Selected Precedent Transactions Analysis in connection with the Previous Proposed Transaction, but did so in connection with the Proposed Transaction.

76. All of this information must be disclosed to the Company's stockholders prior to the stockholder vote on the Proposed Transaction to allow them to determine for themselves whether Wells Fargo skewed the analyses to make the Previous Proposed Transaction -- and then the Proposed Transaction -- appear fair from a financial point of view.

77. *Second*, the Proxy Statement omits material information regarding potential conflicts of interest of Wells Fargo.

78. Specifically, the Proxy Statement fails to disclose the circumstances under which "the Company may pay Wells Fargo Securities a discretionary fee," as well as when and why this provision was added to Wells Fargo's engagement letter,[1] whether the Company intends to make such payment to Wells Fargo, and the estimated amount of such payment.

79. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration,

[1] The discretionary fee is not referenced in the original Registration Statement.

selection, and implementation of strategic alternatives.

80. *Third*, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

81. According to the Proxy Statement:

> Immediately following the effective time of the merger, the board of directors of SJW will be expanded by two seats, with the two new vacancies to be filled by two current Company directors to be selected by SJW. SJW expects that the New England Region (i.e., Connecticut Water Service, Inc. following the completion of the merger) will continue to be led by members of the Company's existing management team.

82. The Proxy Statement must disclose the specific nature and timing of all communications regarding post-Proposed Transaction employment and directorship of the Company's officers and directors, including who participated in all such communications, as well as which two Individual Defendants will serve on the SJW Board.

83. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

84. The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Merger; (ii) Reasons for the Merger; Recommendation of the Board; (iii) Opinion of the Company's Financial Advisor—Opinion of Wells Fargo Securities, LLC; and (iv) Certain Financial Projections Utilized by the Board of Directors and Financial Advisor of the Company.

85. The above-referenced omitted information, if disclosed, would significantly alter

the total mix of information available to the Company's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Connecticut Water

86. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

87. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Connecticut Water is liable as the issuer of these statements.

88. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

89. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

90. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

91. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

92. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

93. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act Against the Individual Defendants

94. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

95. The Individual Defendants acted as controlling persons of Connecticut Water within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Connecticut Water and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

96. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

97. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

98. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the

1934 Act.

99. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: October 5, 2018

**LACHTMAN COHEN P.C.**

By: ***/s/ Brian S. Cohen***

Brian S. Cohen (CT18878)
500 West Putnam Avenue, Suite 400
Greenwich, CT 06830
(203) 404-4960
Email: bcohen@lcpclaw.com
***Local Counsel for Plaintiff***

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Email: SDR@rl-legal.com
Gina M. Serra
Email: GMS@rl-legal.com
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
(302) 295-5310
***Counsel for Plaintiff***

# CERTIFICATION OF PLAINTIFF

I, Susan Paskowitz ("Plaintiff"), hereby declare as to the claims asserted under the federal securities laws that:

1. Plaintiff has reviewed the complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, and I will testify at deposition or trial, if necessary. I understand that this is not a claim form and that I do not need to execute this Certification to share in any recovery as a member of the class.

4. Plaintiff's purchase and sale transactions in the Connecticut Water Service, Inc. (NasdaqGS: CTWS) security that is the subject of this action during the class period is/are as follows:

**PURCHASES**

| Buy Date | Shares | Price per Share |
|---|---|---|
| 12/1/17 | 50 | $60.90 |
| | | |
| | | |
| | | |

**SALES**

| Sell Date | Shares | Price per Share |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

***Please list additional transactions on separate sheet of paper, if necessary.***

5. Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6. During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3 day of October, 2018.

Susan Paskowitz